# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 18, 2004        Decided March 11, 2005

No. 03-1405

CENTRAL TEXAS TELEPHONE COOPERATIVE, INC., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

SPRINT CORPORATION,
INTERVENOR

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Gregory W. Whiteaker* argued the cause for petitioners. With him on the briefs were *Michael R. Bennet* and *Rebecca L. Murphy*.

*Richard K. Welch*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Catherine G. O'Sullivan* and *Andrea Limmer*, Attorneys, U.S. Department of Justice, *John A. Rogovin*, General Counsel, *Daniel M. Armstrong*, Associate General Counsel, and *Lisa E. Boehley*, Counsel. *Nancy C. Garrison*,

Attorney, U.S. Department of Justice, and *Joel Marcus,* Counsel, Federal Communications Commission, entered appearances.

*Luisa L. Lancetti* and *Charles W. McKee* were on the brief for intervenor Sprint Corporation in support of respondents.

Before: SENTELLE, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Petitioners are rural telephone carriers. Pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a), they seek review of an October 7, 2003, Memorandum Opinion and Order of the Federal Communications Commission dealing with telephone number portability between wireless carriers. *Telephone Number Portability -- Carrier Requests for Clarification of Wireless-Wireless Porting Issues*, CC Docket No. 95-116, 18 F.C.C.R. 20,971 (2003) ("*October Order*"). The issues are whether the Commission adopted the *October Order* in violation of the procedural requirements of the Administrative Procedure Act and the Regulatory Flexibility Act, and whether the *Order* is arbitrary and capricious.

## I.

Under § 251(b)(2) of the Telecommunications Act of 1996, all local exchange carriers (LECs) must "provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission." 47 U.S.C. § 251(b)(2). The 1996 Act also imposes a "duty" on LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). The Act defines "number portability" as

the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another.

47 U.S.C. § 153(30). Congress viewed number portability as a means of encouraging competition: a customer is less likely to switch carriers if he cannot retain his telephone number. *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 513 (D.C. Cir. 2003) ("*CTIA*").

In July 1996, the Commission issued rules and deployment schedules to implement number portability. *See Telephone Number Portability*, 11 F.C.C.R. 8352 (1996) ("*First Portability Order*"), *on recons.,* 12 F.C.C.R. 7236 (1997), *further recons.*, 13 F.C.C.R. 21,204 (1998). Adopting the statutory definition of "number portability" in a regulation, 47 C.F.R. § 52.21(*l*), the Commission required LECs to begin implementing number portability to other LECs, and "to *all* telecommunications carriers, including commercial mobile radio services (CMRS) providers." *First Portability Order*, 11 F.C.C.R. at 8355 ¶ 3 (emphasis added). Although § 251(b)(2) imposed number portability only on LECs, the Commission relied on other statutory provisions to require CMRS -- wireless -- carriers to port numbers among themselves and to and from LECs. 11 F.C.C.R. at 8431-32 ¶ 153; *see CTIA*, 330 F.3d at 508.

At the same time, the Commission refused to impose location portability on either LECs or wireless carriers. The Commission defined location portability as "the ability of users of telecommunications services to retain existing telecommunications numbers without impairment of quality, reliability, or convenience when moving from one physical location to another." 47 C.F.R. § 52.21(j). For LECs, what the

Commission meant by "physical location" was not certain. Among the possibilities were "the customer's physical location, the end of the wire's physical location, or the rate center's physical location." *In the Matter of Starnet, Inc.*, 355 F.3d 634, 638 (7th Cir. 2004). Every 10-digit number is assigned to a rate center, which is a specific geographic location the LEC designates with the approval of a state regulatory commission. For wireline customers, service is fixed at the rate center; the LEC uses the rate center to determine whether a call is a local call or a toll call. The service areas of wireless carriers tend to be larger; because wireless service is mobile, wireless customers can travel out of a rate center and make calls without incurring toll charges. For wireless carriers, the Commission said it would impose "service provider portability." Its regulation defining service provider portability used the same language as the regulatory (and statutory) definition of number portability -- namely, "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 C.F.R. § 52.21(q). The Commission indicated what it meant by "moving from one physical location to another" when it wrote: "Today, telephone subscribers must change their telephone numbers when they move outside the area served by their current central office." *First Portability Order*, 11 F.C.C.R. at 8443 ¶ 174. (A "central office" is a "switching unit, in a telephone system which provides service to the general public, having the necessary equipment and operations arrangements for terminating and interconnecting subscriber lines," 47 C.F.R. Pt. 36 Appendix – Glossary.)

To address technical issues regarding number portability, the Commission turned to the North American Numbering Council (NANC), a federal advisory committee consisting of representatives of the telecommunications industry. In May

1997, the NANC submitted its recommendations regarding wireline-to-wireline porting. Largely adopting the NANC's recommendations in a *Second Portability Order*, 12 F.C.C.R. 12,281 (1997), the Commission also decided that if a state regulatory authority imposed a separate location portability requirement on LECs, this would have to be limited to carriers with a local presence in the same rate center in order to ensure proper rating and routing of calls. The NANC did not address geographic limitations with respect to the obligation of wireless carriers to furnish service provider portability. The Commission therefore requested the NANC to make recommendations regarding wireless carriers, "such as how to account for differences between service area boundaries for wireline versus wireless services and how to implement number portability in a roaming environment." *Id.* at 12,334 ¶ 91. In 1998, The NANC later reported that it had been unable to reach a consensus about intermodal porting, that is, porting between wireless carriers and LECs.

After granting extensions for deploying wireless-to-wireless porting and intermodal porting, the Commission set November 24, 2003, as the date by which LECs had to port to wireless carriers and wireless carriers had to port numbers among themselves in the nation's 100 largest population centers. In other areas, wireless porting had to occur 6 months later. As the deadlines approached, the Cellular Telecommunications & Internet Association (CTIA) filed petitions with the Commission seeking declaratory rulings holding, among other things, that LECs had a duty to port numbers to those wireless carriers whose service areas overlapped the wireline rate center associated with the number, and that wireless carriers had a duty to port numbers to other wireless carriers if their service areas overlapped.

CTIA filed its petitions pursuant to 47 C.F.R. § 1.2, which

states that the "Commission may, in accordance with section 5[(e)] of the Administrative Procedure Act, on motion or on its own motion issue a declaratory ruling terminating a controversy or removing uncertainty." CTIA alleged that certain LECs and rural wireless carriers were narrowly construing their obligation to port numbers to CMRS carriers, claiming that they did not have to port numbers to CMRS carriers that had neither a presence in the rate center from which the ported number originated nor a direct interconnection with the customer's original carrier. The Commission published notices in the Federal Register seeking comments on the issues CTIA raised. 68 Fed. Reg. 7323 (Feb. 13, 2003); 68 Fed. Reg. 34,547 (June 10, 2003).

Among the 100 comments filed with the Commission were those of the Rural Telecommunications Group (RTG), of which at least some petitioners are members. As relevant to this case, the RTG asserted "that in order for one wireless carrier to request number portability from another, the requesting carrier must have a local point of presence, local numbering resources, and local interconnection with the porting out carrier in the rate center with which the ported number is associated." *October Order*, 18 F.C.C.R. at 20,977 ¶ 19. If these requirements were not imposed, according to the RTG, number portability "will lead to massive customer confusion and discrimination against small and rural carriers." *Id.*

The Commission issued two opinions and orders in response to CTIA's petitions. The first, handed down on October 7, 2003, the *October Order*, dealt only with wireless-to-wireless porting. The second, issued on November 10, 2003, dealt with wireline-to-wireless porting. Only the *October Order* is before us in this case.

The *October Order* rejected the RTG's claims. The

Commission decided that nothing in its rules restricted wireless-to-wireless number portability in the manner the RTG proposed and that imposing those restrictions would undermine the competitive benefits of number portability. To limit "wireless-wireless porting based on wireline rate centers would be to limit the ability of some consumers to port their telephone numbers from one wireless carrier to another. We see no reason to impose such restrictions on the competitive alternatives available to wireless consumers." *October Order*, 18 F.C.C.R. at 20,978 ¶ 22. The Commission recognized the "rating" issues rural wireless carriers had raised and their concern that "in porting numbers to wireless carriers that do not have a point of presence in the local area, a donating rural wireless carrier delivering a call to a ported number would be forced to deliver the call outside of its local service area and thereby incur transport charges that were not factored into its rate design." *Id.* at ¶ 23. The Commission refused to address these issues in its *October Order* because its wireless porting rules did not depend on "how calls to the number will be rated and routed after the port occurs" and because it would consider the issues in separate proceedings. *Id.* The end of the opinion, in a section entitled "Procedural Matters and Ordering Clauses," stated: "The Commission is not required by the Regulatory Flexibility Act, 5 U.S.C. § 604 to prepare a Regulatory Flexibility Analysis of the possible economic impact of this order on small entities." *Id.* at 20,894 ¶ 42.

One month later, in another "Memorandum Opinion and Order" which we shall call the *Intermodal Order*, the Commission dealt with porting between wireline and wireless carriers. *Memorandum Opinion and Order and Further Notice of Proposed Rulemaking*, 18 F.C.C.R. 23,697 (Nov. 10, 2003). Although the Commission had already limited wireline-wireline porting "to carriers with facilities or numbering resources in the same rate center," *Intermodal Order*, 18 F.C.C.R. at 23,700 ¶ 7

(footnote omitted), it refused to do so for intermodal porting, despite claims that the absence of restrictions would amount to location portability. In the context of intermodal porting, the Commission concluded "that porting from a wireline to a wireless carrier that does not have a point of interconnection or numbering resources in the same rate center as the ported number does not, in and of itself, constitute location portability, because the rating of calls to the ported number stays the same." *Id.* at 23,708 ¶ 28. In the intermodal setting, porting is required if the wireless carrier's coverage area encompasses the rate center to which the ported number is assigned. *Id.* at 23,707 ¶ 25. The *Intermodal Order* refused to require interconnection agreements for intermodal porting because this would delay intermodal porting and thus undermine its benefits to consumers. *Id.* at 23,712 ¶ 36. In view of claims that wireless carriers would be getting an unfair competitive advantage over wireline carriers as a result of the *Intermodal Order*, the Commission issued a notice of proposed rulemaking seeking comment on, among other things, "how to facilitate wireless-to-wireline porting where there is a mismatch between the rate center associated with the wireless number and the rate center in which the wireline carrier seeks to serve the customer." *Id.* at 23,714 ¶ 42.

## II.

Petitioners' arguments are that the *October Order* constituted a legislative rule promulgated in violation of the Administrative Procedure Act and the Regulatory Flexibility Act, and that even if the *Order* constituted an interpretive rule exempt from notice and comment rulemaking, the *Order* should be set aside as arbitrary and capricious. We believe we may consider the merits of these arguments despite the Commission's claims that petitioners lack standing and that their petition for judicial review was untimely.

As to standing, the Commission argues that the *October Order* did not injure petitioners because their objections are directed to the Commission's pre-existing interconnection rules rather than to the wireless-to-wireless porting requirements. We think there is nothing to this. For one thing, two of the four petitioners are both wireline and wireless carriers (the other two are LECs only). As wireless carriers, the *Order* directly affects their porting obligations to other wireless carriers and does so, according their lights, despite the Commission's violations of the procedural and substantive requirements of the APA. That in itself is sufficient to confer standing on them. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62, 572 n.7 (1992). For another thing, even in their capacity as LECs, the order damages -- again by petitioners' lights -- their financial interests, because they will be unable to recover the additional costs entailed in wireless-to-wireless porting of numbers tied to their rate centers.

We also reject the Commission's argument that petitioners are really mounting an untimely challenge to the porting requirements of the *First Portability Order* because the Commission's *October Order* merely reiterated those requirements. The argument goes to the merits. Petitioners claim that the *October Order* amended the earlier order in violation of the rulemaking procedures of the APA. The petition for judicial review is therefore timely.

### III.

The controversy is a common one for this court: petitioners view the *October Order* as embodying a "substantive rule"; the Commission defends on the ground that the *Order* is an "interpretative rule." By a "substantive rule" -- or as we call it, a "legislative rule," a term not used in the APA -- petitioners

mean a rule that may be promulgated only after compliance with the rulemaking requirements of § 553 of the APA.  5 U.S.C. § 553.  By "interpretative rule," a term the APA does use, the Commission means a rule that § 553(b)(3)(A) exempts from those requirements.  5 U.S.C. § 553(b)(3)(A).

It is fair to ask why both sides assume that we are even dealing with the making of a rule, whether of the legislative or interpretive variety.  Agencies often have a choice of proceeding by adjudication rather than rulemaking. The National Labor Relations Board, for one, has traditionally preferred to proceed this way and the Supreme Court has upheld its preference for adjudication. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290-95 (1974); *see also SEC v. Chenery Corp.*, 332 U.S. 194 (1947).  Orders handed down in adjudications may establish broad legal principles.  In this case, the Commission issued its *October Order* in response to CTIA's "Petition for Declaratory Ruling."  The petition sought an adjudication.  CTIA expressly invoked Commission Rule 1.2, 47 C.F.R § 1.2, a provision giving the Commission the authority to issue declaratory orders.  Section 1.2 refers to § 554(e) of the APA, which states: "The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove an uncertainty."  5 U.S.C. § 554(e).  Section 554(e) is a subsection of the provision governing formal adjudication.  While the proceedings in this matter did not constitute formal adjudication, there is some authority to the effect that the declaratory ruling provision in § 554(e) may be used in informal adjudication.  *See* Jeffrey S. Lubbers & Blake D. Morant, *A Reexamination of Federal Agency Use of Declaratory Orders*, 56 ADMIN. L. REV. 1097, 1112-14 (2004), citing cases; *but see* ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 59 (1947).  The fact that the Commission operated under Rule 1.2, rather than directly under § 554(e), may also make a difference.   Here, the resulting

Commission ruling is itself styled "Memorandum Opinion and Order." Opinions are the end products of adjudications. Although the Commission used the Federal Register to notify interested parties of CTIA's petition, and to solicit comments on the issues the petition raised, the Federal Register announcement did not suggest that the proceeding would be anything other than an adjudication. *See* 68 Fed. Reg. 34,547 (June 10, 2003). *See New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 815 (D.C. Cir. 1984).

We have included the foregoing discussion despite the Commission's failure to defend the *October Order* on the ground that it resulted from an adjudication. We think it important to make clear that we are simply assuming that the *October Order*, issued in a proceeding commenced under Commission Rule 1.2, constituted some sort of rule -- legislative or interpretive -- rather than the outcome of an informal adjudication. *Compare Sprint Corp. v. FCC*, 315 F.3d 369, 372 (D.C. Cir. 2003). Given the broad definition of "rule" in APA § 551(4) -- "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" -- the *October Order* may comfortably be considered a "rule," as may many other agency actions. *See* Ronald M. Levin, *The Case for (Finally) Fixing the APA's Definition of "Rule*," 56 ADMIN. L. REV. 1077 (2004). And it may be so considered despite the Commission's calling what it did here an "Order." Although the APA defines "order" as a final disposition other than in a rulemaking, 5 U.S.C. § 551(6), the Commission uses the designation "order" even when it issues legislative rules after overt § 553 rulemaking. *See, e.g., First Portability Order*, *supra*.

As to petitioners' complaint that the Commission's procedure, or lack thereof, violated the APA, the reasons given in the companion case dealing with the November *Intermodal*

*Order*, *United States Telecom Ass'n, et al. v. FCC*, Nos. 03-1414 & 03-1443 ("*USTA*"), are enough to show that the notice and comment requirements of APA § 553 were sufficiently satisfied, even if the *October Order* were a legislative rule. But that cannot end the procedural question for the same reason it could not bring the question to an end in USTA. The Commission failed to issue an impact statement under § 604 of the Regulatory Flexibility Act, 5 U.S.C. § 604, and petitioners -- who describe themselves as small entities, see 5 U.S.C. § 611 -- claim that they were entitled to one. Because § 604 requires such a statement for rules that must be promulgated in accordance with § 553 of the APA, but not for interpretive rules (or adjudicative decisions), we must determine within which category the *October Order* falls. We must do so even though petitioners' representative never raised the Regulatory Flexibility Act in the proceedings leading to the *October Order*. The RTG preserved the question, just barely, by stating in one sentence of its comments on CTIA's petition that before the Commission could side with CTIA, it would have to conduct a rulemaking.

We may approach the question this way. If a "second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993), *quoting Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) (inner quotations omitted). Petitioners say the *October Order* is such an amendment because it required location portability for wireless-to-wireless porting despite the *First Portability Order*'s rejection of location portability. For location portability in the context of wireless-to-wireless porting, they assert that "the relevant location is not the physical location of the customer but the location of the serving switch or

the POI [point of interconnection]." Brief of Petitioners at 20.

Everyone, including petitioners, recognizes that today a typical wireless customer can make calls from locations throughout the country without switching his telephone number -- something a wireline customer obviously cannot do without location portability. *Id.* at 21 n.53. To illustrate, suppose a wireless customer living in Arizona moves to Texas, keeping his cell phone number. After living in Texas for several years he decides to change carriers and requests the old carrier to port his cell phone number to the new carrier. As the Commission discusses in its brief, the *First Portability Order* would require the old carrier to port the number. (The assumption is that the service areas of the old and new wireless carriers overlap.) Number portability and service provider portability mean, according to the rules promulgated in the *First Portability Order*, the ability of customers to retain their telephone numbers when switching carriers while the customers stay in the same location. 47 C.F.R. § 52.21(*l*) & (q). That fits the hypothetical precisely. Location portability, on the other hand, does not depend on a customer's changing from one carrier to another. The customer may want to stay with the same carrier when he moves out of the area of its coverage. In that situation, as the *First Portability Order* recognizes, the customer would not be able to keep his number unless his carrier took steps to port the number, something the Commission refused to require. *See* 47 C.F.R. § 52.21(j).

What we have just written summarizes the reasons underlying the Commission's conclusion, in its *October Order*, that in wireless-to-wireless porting, the relevant location is not -- as petitioners argue -- the location of the serving switch or point of interconnection. *October Order*, 18 F.C.C.R. at 20,972 ¶ 2. Location portability means, as the Commission explained in the *First Portability Order*, that customers could keep their

telephone numbers after moving out of the area their current central office served. *First Portability Order*, 11 F.C.C.R. at 8443 ¶ 174. But in the wireless context, customers who move, temporarily or permanently, may retain their numbers. They may do so not because there is location portability, but because, despite their moves, they are still within an area their current wireless carrier serves.

While the *October Order* therefore did not repudiate the *First Portability Order* by requiring location portability in wireless-to-wireless porting, that does not necessarily render it an interpretive rule. *See Am. Mining Cong.*, 995 F.2d at 1112. To fall within that category, the rule must be interpreting something. It must "derive a proposition from an existing document whose meaning compels or logically justifies the proposition. The substance of the derived proposition must flow fairly from the substance of the existing document." Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog*, 8 ADMIN. L. REV. 1, 6 n.21 (1994). If, despite an agency's claim, a rule cannot fairly be viewed as interpreting -- even incorrectly -- a statute or a regulation, the rule is not an interpretive rule exempt from notice-and-comment rulemaking. *E.g., Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997); *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165 (7th Cir. 1996); *see* HENRY J. FRIENDLY, BENCHMARKS 144-45 (1967). This is not to say that only interpretive rules interpret. The APA's definition of "rule" contemplates that all types of rules, legislative and interpretive alike, may interpret "law." The EPA regulations at issue in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), for instance, interpreted the term "stationary source" in the Clean Air Act (and did a good deal more). Nor may one say that there is a clear "line between interpretation and policymaking." John F. Manning, *Nonlegislative Rules*, 72 GEO. WASH. L. REV. 893, 924 (2004).

*Chevron* recognized that an agency's choice among plausible meanings of a statute may be influenced by considerations of policy. The Supreme Court has said much the same regarding an agency's interpretation of its regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

We believe the *October Order* is fairly characterized as an interpretive rule and that it "sensibly conforms to the purpose and wording" of the *First Portability Order*. *Northern Ind. Pub. Serv. Co. v. Porter County Chapter of the Izaak Walton League of Am., Inc.*, 423 U.S. 12, 15 (1975). In arguing about why the *October Order* did, or did not, amount to an interpretive rule, neither the Commission nor petitioners focus entirely on the language of actual regulations issued in the *First Portability Order.* Much of their attention is on the *First Portability Order*'s statement explaining, in several hundred paragraphs, the action the Commission was taking. The Commission's statement was meant to comply with APA § 553(c)'s requirement that when an agency promulgates rules, it must include "a concise general statement of their basis and purpose." The drafters of the APA recognized the function and importance of such statements: "the courts and the public may use such statements in the interpretation of the agency's rules." ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 32 (1947).

The issue CTIA had posed in its petition for a declaratory ruling, and the issue discussed in the comments of the RTG ,was whether the *First Portability Order* embodied the conditions on wireless-to-wireless portability some rural carriers insisted upon. The Commission said it did not. Rather than pointing to specific language in the *First Portability Order* that supposedly imposed those restrictions, petitioners draw an analogy -- wrongly, the Commission thought -- to wireline-to-wireline porting. In that context, the Commission's *Second Portability Order* required

that the porting-in carrier have a presence in the same rate center as the porting-out carrier. From this, petitioners conclude that "it would be only logical" that the Commission had also intended to so restrict wireless-to-wireless porting. Brief of Petitioners at 26.

The Commission failed to see the logic. It reviewed its *First Portability Order* and the rules promulgated in that proceeding: "Nothing in the rules provides that wireless carriers must port numbers only in cases where the requesting [wireless] carrier has numbering resources and/or a direct interconnection in the rate center associated with the number to be ported and wireless carriers may not demand that [other wireless] carriers meet these conditions before porting." *October Order*, 18 F.C.C.R. at 20,977 ¶ 21. This is true, but not all that persuasive. The regulations themselves contained little detail and basically repeated the language of the Act. But the Commission's *October Order* did not stop with a negative. It went on to explain why petitioners' "logical" inference was mistaken. In giving its explanation, the Commission properly considered a purpose of its *First Portability Order* -- to promote competition among wireless carriers. The Supreme Court has observed that an agency construing its regulations "is in a better position . . . to reconstruct" their "purpose," in part because of the agency's "historical familiarity" with the reasons underlying the regulatory language. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152-53 (1991). Restricting wireless-to-wireless porting in the manner petitioners proposed would, the Commission determined, greatly undermine the competitive benefits of wireless number portability because the restrictions would prevent many wireless customers from having their numbers ported to other wireless carriers whose service areas overlapped. *October Order*, 18 F.C.C.R. at 20,978 ¶ 22. And it would have this deleterious effect even though "wireless service is spectrum-based and mobile in nature" and even

though, as a result, "wireless carriers do not utilize or depend on the wireline rate center structure to provide service . . . ." *Id.*

Petitioners' arguments in favor of treating the *October Order* as a legislative rule rest on the premise that the Commission expanded or altered the porting obligations of wireless carriers. For the reasons just given we think the Commission was on solid ground in deciding that those obligations flowed from the *First Portability Order* and that it was petitioners who wanted to impose new restrictions by engrafting the wireline regime on wireless-to-wireless porting. In any event, to the extent petitioners are contending that interpretive rules cannot be conduct-altering, the law is to the contrary. We have held, for instance, that an agency may use an interpretive rule to transform "a vague statutory duty or right into a sharply delineated duty or right." *Health Ins. Ass'n of Am. v. Shalala,* 23 F.3d 412, 423 (D.C. Cir. 1994). We have held that an interpretive rule does not have to parrot statutory or regulatory language but may have "the *effect* of creating new duties." *Fertilizer Inst. v. United States EPA,* 935 F.2d 1303, 1308 (D.C. Cir. 1991). *American Mining Congress*, 995 F.2d at 1107-08, found a rule to be interpretive even though it altered primary conduct. So did *Fertilizer Institute,* 935 F.2d at 1308-9; *Air Transp. Ass'n of Am. v. FAA,* 291 F.3d 49, 52-55 (D.C. Cir. 2002); and, among others, *Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).

Nearly all of petitioners' arguments revolve around what they perceive as the adverse financial impact on rural LECs stemming from the Commission's refusal to limit wireless-to-wireless porting in the manner they proposed. There was a time when this court used a "substantial effects" or "substantial impact" test to help draw a line between legislative rules and general statements of policy, which are also exempt from notice-and-comment rulemaking under APA § 553(b)(3)(A). *See, e.g.,*

*Pickus v. Bd. of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974). But we rejected such a test for determining whether an agency pronouncement was a legislative rule or an interpretive rule. Because both types of rules may "vitally affect private interests," the "substantial impact test has no utility in distinguishing between the two." *Cabais v. Egger*, 690 F.2d 234, 237-38 (D.C. Cir. 1983). Or, as we stated in *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987), "the mere fact that [an interpretive] rule may have a substantial impact 'does not transform it into a legislative rule,'" *quoting American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 560 (D.C. Cir. 1983).

We therefore hold that the *October Order* constituted an interpretive rule under § 553(b)(3)(A) of APA. It follows that the Commission was not required to issue an impact statement under § 604 of the Regulatory Flexibility Act, which applies only to legislative rules.

IV.

Even if the *October Order* is an interpretive rule, petitioners say it must be set aside as "arbitrary"and "capricious." 5 U.S.C. § 706(2)(A). One of their arguments deals with the Commission's determination that "no carrier may unilaterally refuse to port with another carrier because that carrier will not enter into an interconnection agreement." *October Order*, 18 F.C.C.R. at 20,977-78 ¶ 21; *see also id.* at 20,978 ¶ 24. In the absence of an interconnection agreement, the Commission found that its *First Portability Order* required carriers to "port numbers upon request, with no conditions." *Id.* at ¶ 24. Petitioners maintain that the "structure of the Act clearly requires that number portability be imposed and accomplished within the context of carrier interconnection agreements," Brief of Petitioners at 41, and that the *October Order* "prohibits"

LECs from requiring the porting-in carrier to "negotiate the terms of interconnection." *Id.* at 43.

The argument is unconvincing. The *October Order* dealt only with wireless-to-wireless porting; the porting obligations of LECs were the subject of the *Intermodal Order* issued one month later. Also, the *October Order* did not prohibit any LEC from negotiating an interconnection agreement with any other carrier. The Commission simply decided that the absence of an interconnection agreement did not, under the *First Portability Order*, excuse one wireless carrier from porting a number to another wireless carrier. Furthermore, the procedures set forth in § 252 of the Act, which govern the negotiation and arbitration of interconnection agreements, apply by their terms exclusively to incumbent LECs. 47 U.S.C. § 252.

The source of the Commission's authority here and in the portion of the *First Portability Order* dealing with wireless porting, was not that section but others. Petitioners correctly point out that § 251(c)(2)(b) of the Act requires incumbent LECs to permit interconnection "within" their network. But it is not correct that the *October Order* "effectively negates" this provision. Brief of Petitioners at 44. Under the Act, wireless carriers can choose to interconnect indirectly -- that is, outside of their respective networks. *First Portability Reconsideration Order*, 12 F.C.C.R. at 7305 ¶ 121 (citing 47 U.S.C. § 251(a)(1)).

Petitioners also claim that the *October Order* is arbitrary because the Commission failed to consider the impact of the *Order* on petitioners with respect to rating and routing. The Commission recognized these concerns but found them to be "outside the scope of this order." *October Order*, 18 F.C.C.R. at 20,978 ¶ 23. The "rating and routing issues raised by the rural wireless carriers have been raised in the context of non-ported numbers and are before the Commission in other proceedings."

*Id.*

The Commission has discretion "to defer consideration of particular issues to future proceedings when it thinks that doing so would be conducive to the efficient dispatch of business and the ends of justice." *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004). There is good reason to believe, as the Commission did, that further factual development was needed to assess petitioners' claims. For one thing, it is not apparent that this proceeding -- dealing as it did with wireless-to-wireless porting -- was the appropriate forum in which to address their concerns. Petitioners' complaint is about their obligation to pay additional transport costs associated with the delivery of calls outside the local exchange. That problem, if it is one, does not depend on whether the call is to a number that has or has not been ported between wireless carriers. Applicants for a stay of the *Intermodal Order* had claimed, as petitioners claim here, "that there is no established method for routing and billing calls ported outside of the local exchange." *Telephone Number Portability -- United States Telecom Ass'n and CenturyTel of Colorado, Inc., Joint Petition for Stay Pending Judicial Review*, 18 F.C.C.R. 24,664, 24,666 ¶ 9 (Nov. 20, 2003). The Commission's response, given before the November 24, 2003, deadline, underscores why it acted responsibly in postponing consideration of these issues: "today, in the absence of wireline-to-wireless [number portability], calls are routed outside of local exchanges and routed and billed correctly. We thus find that, without more explanation, the scope of the alleged problem and its potential effect on consumers is unclear." *Id.*

\*  \*  \*

We have considered and rejected petitioners' other arguments. For the reasons stated above we hold that the *October Order* was an interpretive rule, that petitioners were

therefore entitled to no further process under the APA or the Regulatory Flexibility Act, and that the *October Order* was not arbitrary or capricious. The petition for judicial review is therefore denied.

*So ordered.*