TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-05-00172-CV




ASAP Paging Inc., Appellant

v.

Public Utility Commission of Texas and CenturyTel of San Marcos, Inc., Appellees





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. GN304831, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING




O P I N I O N


                        ASAP Paging, Inc. (ASAP) is a Commercial Mobile Radio Service (CMRS) provider
that also provides wireline connections for Internet Service Providers (ISPs). ASAP alleges that
CenturyTel of San Marcos, Inc. (CenturyTel) charged CenturyTel’s customers a long-distance toll
for calls to ASAP’s paging and ISP customers in violation of federal and state telecommunications
law. According to ASAP, these calls should be rated as toll-free local calls under Extended Local
Calling Service (ELCS), and, if they are not so rated, the toll charge will deter CenturyTel’s
customers from calling ASAP’s customers. In response, CenturyTel contends that it is entitled to
charge a toll because the calls do not qualify for ELCS and are properly rated as long-distance. The
Public Utilities Commission (PUC) found that calls from CenturyTel’s customers in San Marcos to
ASAP’s paging and ISP customers were properly charged long-distance toll. The district court
rendered judgment affirming the PUC’s order. We will affirm the judgment of the district court.

BACKGROUND
The regulatory framework
                        To understand the context of the present dispute, we begin by surveying the
framework of federal and state telecommunications regulation within which this dispute arose. 

       Federal authority
                        The Telecommunications Act of 1996 (the “Telecommunications Act”) amended the
Federal Communications Act of 1934 and, in doing so, fundamentally altered the nature of
telecommunications. See Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 15 and
47 U.S.C.). Historically, regulation of this industry was premised on the belief that service could
be provided at the lowest cost to the maximum number of consumers through a regulated monopoly
network. Over many decades, state and federal agencies regulated the prices and practices of these
monopolies and protected them against competitive entry. The Telecommunications Act adopts
precisely the opposite approach. Rather than shielding telephone companies from competition, this
Act requires telephone companies to open their networks to competition.


 The legislation was
enacted in an effort to “promote competition and reduce regulation in order to secure lower prices
and higher quality services for American telecommunication consumers and encourage the rapid
deployment of new telecommunications technologies.” Telecommunications Act pmbl, 110 Stat.
at 56. The Telecommunications Act grants the Federal Communications Commission (FCC) plenary
jurisdiction over telephone numbering issues and gives the FCC the authority to delegate to state
commissions or certain other entities all or any portion of its jurisdiction. See 47 U.S.C.A. § 251(e)
(West 2001).




       Rate centers
                        Telephone numbers are assigned on a nondiscriminatory basis under the FCC by the
North American Numbering Plan Administrator (NANPA). 47 C.F.R. § 52.13(a), (d) (2005).


 
NANPA issues telephone numbers in blocks of 10,000, and each telephone number has ten digits,
appearing generically as: NPA-NXX-XXXX. The first three digits (NPA) represent the area code;
the second three digits (NXX) identify the particular carrier and switch to which the call is routed;
and the last four digits (XXXX) identify the customer served by the switch. See id. §§ 52.7(a), (c). 
                        The switch is a device that channels incoming data from any of multiple input ports
to the specific output port that will take the data toward its intended destination. In the traditional
circuit-switched telephone network, one or more switches are used to set up a temporary connection
or circuit for an exchange between two or more parties. 
                        The NXX digits carry special importance to this case because they signify the
applicable “rate center” for each telephone number. Rate centers are associated with the switches
serving the calling and called parties to determine whether a call is local or toll and to compute the
air mile distance for rating the toll call. Calls placed from one rate center to another center not on
the local list for the caller’s rate center generally are considered toll calls. Thus, most carrier billing
systems rely on NPA-NXX code information for rating calls. In re Numbering Resource
Optimization, 14 FCC Rcd 10322, 10370 (1999) (FCC NRO) (internal citations omitted).
                        To provide sufficient telephone numbers for their customers, telephone companies
need to acquire a rate center, depending on whether they are wireless


 or wireline providers. 
Wireline services are fixed to a specific location, and a subscriber’s telephone number is limited to
use within the rate center within which it is assigned. Wireless services, on the other hand, are not
fixed to a specific location because they are mobile. Thus, while the wireless subscriber’s number
is associated with a specific geographic rate center, the wireless service is not limited to use within
that rate center. For wireline services, “[NXXs] allocated to a wireline Service Provider are to be
utilized to provide service to a customer’s premise physically located in the same rate center that the
[NXXs] are assigned.” But wireless service providers “offer larger calling areas and thus require
fewer NXX codes for the wireless service, [so] they often must request as many NXX codes as are
required to permit wireless customers to be called by wireline customers on a local basis.” Id.

       Interconnection 
                        After the implementation of the Telecommunications Act, incumbent local exchange
carriers (ILECs) struggled with the onset of competitive local exchange carriers (CLECs) and
commercial mobile radio service (CMRS) providers.


 To make it easier for new companies to enter
the telecommunications market, the Telecommunications Act requires ILECs to provide
interconnection


 at their pre-existing networks to any requesting telecommunications carrier at any
technically feasible point.


 See 47 U.S.C.A. § 251(c)(2) (West 2001). This interconnection must
be at least equal in quality to that provided by the ILEC to itself or its affiliates, and must be
provided on rates, terms, and conditions that are just, reasonable, and nondiscriminatory. Id. 
                        Two basic types of interconnection exist. Type 1 service involves interconnection
to a telephone company end office similar to that provided to a private branch exchange (PBX). 
Under Type 1 interconnection, the telephone company owns the switch serving the CMRS network
and, therefore, performs the origination and termination of both incoming and outgoing calls. Under
Type 2, the CMRS provider owns the switch, enabling it to originate outgoing calls and to terminate
incoming calls. See generally Cellular Interconnection Proceeding, 4 FCC Rcd 2369, 2372 & n.
16 (1989). ASAP uses only Type 2 interconnections.



                        In addition to providing interconnection, an ILEC must also provide dialing parity. 
See 47 U.S.C.A § 153(15) (West 2001). Dialing parity enables a customer of a new LEC to dial
others with the convenience an incumbent provides, regardless of which carrier the customer has
chosen as the local service provider. See 47 C.F.R § 51.207. Under this requirement, an ILEC will
allow customers within a local calling area to dial the same number of digits (seven or ten) to make
a local phone call, regardless of the customer’s service provider. Id. The FCC has concluded that
this requirement must apply to intrastate, local and toll services. See In re Implementation of the
Local Competition Provisions of the Telecomms. Act of 1996, 11 FCC Rcd 19392, 19400, 19406
(1996) (Second Report & Order).
                        For CMRS providers, in order for the provider’s customers to be paged or called,
these calls would travel over—and eventually terminate


 at—ILEC networks. Due to the dependency
on these pre-existing networks, the FCC has established special guidelines. ILECs are obligated,
pursuant to section 251(b)(5) of the Telecommunications Act and the corresponding pricing
standards of section 252(d)(2), to enter into reciprocal compensation arrangements with CMRS
providers, including paging providers, for the transport and termination of traffic on each other’s
networks. See TSR Wireless, 15 FCC Rcd at 11168-69, 11183. Because many CMRS providers
offer telephone exchange service and exchange access, the ILECs therefore must make
interconnection available to these CMRS providers in conformity with sections 251(c) and 252. See
id. at 11183.

       Reciprocal compensation
                        The Telecommunications Act requires interconnecting LECs to establish reciprocal
compensation arrangements for the transport and termination of telecommunications. 47 U.S.C.A.
§ 251(b)(5) (West 2001). A reciprocal compensation arrangement is one in which a carrier receives
compensation from another carrier for the transport and termination of telecommunications traffic
on the first carrier’s network facilities. See 47 C.F.R. § 51.701(e). This is also referred to as
“transiting traffic”: traffic that originates from a carrier other than the interconnecting LEC but
nonetheless is carried over the LEC network to the paging carrier’s network. TSR Wireless, 15 FCC
Rcd at 11177 n.70; see Local Competition Order, 11 FCC Rcd at 16016-17. In addition, the paging
carrier would be responsible for paying charges for facilities ordered from the LEC to connect points
on the paging carrier’s side of the point of interconnection,


 such as facilities ordered to connect the
paging terminal with its antennas. TSR Wireless, 15 FCC Rcd at 11177 n.70.
Access charges



                        The FCC has concluded that LECs are not required to offer wide-area calling or
similar services at all, nor are they required to offer these services without charge. Id. at 11183-84. 
Thus, the FCC has determined that its rules do not preclude LECs from charging CMRS providers
for offering wide-area calling or similar services. Id. Instead, the FCC concerns itself only with how
carriers must compensate each other for the transport and termination of calls.


 See 47 CFR
§ 51.703(b); see generally TSR Wireless, 15 FCC Rcd at 11177-78, 11181, 11184-85.
                        Telephone service is organized into multiple local access and transport areas
(LATAs),


 which often cross state boundaries. “IntraLATA” calls originate and terminate within
a single LATA whereas “interLATA” calls cross LATA boundaries. Although intraLATA calls may
show up on a customer’s bills as local calls, they may also appear as “in-state long distance” calls. 
These categories and their applicable rates are left to the discretion of the state public utility
commissions.


 The purpose of establishing the LATAs was only to delineate the areas within which
the former Bell companies would be permitted to provide telecommunications services (intraLATA
services); it was “not to distinguish the area in which a telephone call [would] be ‘local’ from that
in which it becomes a ‘toll’ or long distance call.” United States v. Western Elec. Co., 569 F. Supp.
990, 995 (D.C. Circ. 1983).
                        To avoid access charges, it is possible to assign customers “virtual NXXs,” or
“VNXXs,” so that a call termination is identified not by its physical location but by a location of the
customer’s choice. See Global NAPS, Inc. v. Verizon New England Inc., 327 F. Supp. 2d 290, 295
(D. Ver. 2004). The customer thus does not pay toll charges if the VNXX is the same as the NXX
of the call termination, and the call would not be subject to access charges for purposes of
intercarrier compensation. Id. “Essentially, VNXX service converts what would otherwise be toll
calls into local calls.” Id. 
                        Access charges are usually determined by the location of the callers, but CMRS
customers are mobile and may travel between locations during a single call. Implementation of the
Local Competition Provisions in the Telecomms. Act of 1996 (Part II), 61 Fed. Reg. 45476, 45579
(Aug. 29, 1996) (Implementation, Part II). The FCC has provided some guidance for service
providers in determining whether the call should be local or toll. Id. It is not necessary for
incumbent LECs and CMRS providers to ascertain geographic locations when determining the rating
for any particular call at the moment the call is connected. Id. “For administrative convenience, the
location of the initial cell site when a call begins shall be used as the determinant of the geographic
location of the mobile customer.” Id. As an alternative, ILECs and CMRS providers may use the
point of interconnection between the two carriers at the beginning of the call to determine the
location of the mobile caller or called party. Id. Ultimately, CMRS providers and LECs, both
incumbent and competitive, will receive reciprocal compensation for terminating certain traffic that
originates on the networks of other carriers, and will pay such compensation for certain traffic that
they transmit and terminate to other carriers. Id.

       ISP-bound traffic
                        The internet is an international network of interconnected computers enabling people
to communicate with one another and to access information from around the world. See In re
Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 14 FCC Rcd
3689, 3690 (1999) (Initial Order). The internet functions by splitting up information into “small
chunks or ‘packets’ that are individually routed . . . to their destination.” In re Federal-State Joint
Bd. on Universal Serv., 13 FCC Rcd 11501, 11531-32 (1998). With packet-switching, “even two
packets from the same message may travel over different physical paths through the network”
enabling users to invoke multiple internet services simultaneously and “to access information with
no knowledge of the physical location of the service where the information resides.” Id.
                        An Internet Service Provider (ISP) is an entity that provides its customers the ability
to obtain online information through the internet. See Initial Order, 14 FCC Rcd at 3690. ISPs
purchase analog and digital lines from LECs to connect to their dial-up subscribers. Id. In a typical
dial-up arrangement, an ISP customer dials a seven-digit number to reach the ISP server in the same
local calling area. Id. The ISP, in turn, combines “computer processing, information storage,
protocol conversion, and routing with transmission to enable users to access Internet content and
services.” Id. (quoting In re Federal-State Joint Bd. on Universal Serv., 13 FCC Rcd at 11531). 
Under this arrangement, the end user generally pays the LEC a flat monthly fee for use of the local
exchange network and generally pays the ISP a flat, monthly fee for internet access. Id. The ISP
typically purchases business lines from an LEC, for which it pays a flat monthly fee that allows
unlimited incoming calls. Id.

       State authority
                        The Public Utility Regulatory Act (PURA) governs telecommunications regulation
in Texas. See Tex. Util. Code Ann. §§ 51.001-65.252 (West 1998 & Supp. 2005).
                        Historically, in rural areas and small towns in Texas, calls within a small area were
considered local, but calls to adjoining towns were treated as toll calls. In the rural areas, callers
were charged a toll when they called geographically nearby phone numbers. In 1993, the legislature
created the Expanded Toll-Free Local Calling Areas (ELCS), authorizing the PUC to expand “a
toll-free local calling area into an exchange that is not in a metropolitan exchange but is in a local
calling area that is contiguous to a metropolitan exchange that the [PUC] determines has a
community of interest with the exchange.” Tex. Util. Code Ann. § 55.042 (West 1998); see
generally id. §§ 55.041-.048. In particular, rural telephone customers may petition the PUC for
expansion of a toll-free local calling area by demonstrating that they have a “community of interest”
with the requested exchange area.


 Id. § 55.042. Telephone subscribers of an ILEC exchange that
serves not more than 10,000 access lines may petition the PUC for expansion of the company’s
toll-free local calling area if:
 
(1)  the petitioning exchange’s central switching office is located within 22 miles,
using vertical and horizontal geographic coordinates, of the central switching
office of the exchange requested for expanded local calling service; or
 
(2)  the petitioning exchange’s central office is not more than 50 miles from the
central office of the exchange requested for expanded local calling service and
the exchanges share a community of interest.
 
 
Id. § 55.045. The PUC may decline the petition for a variety of reasons. Id. § 55.044.
                        If the PUC approves an ELCS, customers will not be charged a toll when they call
within the ELCS. Theoretically, the ILEC would lose money by routing these calls beyond their
initial local calling scope without receiving the applicable toll charges. To compensate for this, the
ILEC may impose a monthly fee against each individual and business customer in the petitioning
exchange. Id. § 55.048(b). The ILEC may also impose a monthly fee against each of its customers
in the state. Id. § 55.048(c). 
                        In 1995, the PUC established an ELCS between the rate center of Kyle, Fentress, and
Lockhart and that of San Marcos. Accordingly, calls made between telephone customers or
businesses within these cities do not have to pay a toll charge, but they do have to pay a monthly fee
to their ILEC. This ELCS does not include Austin. ELCS service in that area is provided by means
of direct end-to-end office trunks between the San Marcos and the Kyle, Fentress, and Lockhart
exchanges. 

The dispute
                        ASAP Paging, Inc. (ASAP) is a CMRS that provides paging services to its customers. 
It also provides internet-bound services to ISPs. ASAP bought and obtained three blocks of NXXs
associated with the ELCS communities of Kyle, Fentress and Lockhart.


 It assigned approximately
thirty numbers in the Lockhart block to its paging customers


 but did not assign any of the Kyle and
Fentress blocks to paging customers, instead assigning those numbers only to ISPs. Over 99% of
calls to ASAP’s Kyle, Fentress, and Lockart NXXs are directed to ASAP’s ISP customers, all of
whom are located in Austin.
                        ASAP is interconnected with two Austin LATA access tandems owned by
Southwestern Bell Telephone (SWBT)


 (Greenwood and Homestead).


 Its switch is located in
downtown Austin and services all of its Austin LATA operations. ASAP does not have a switch,
end office, nor a point of interconnection in either Kyle, Fentress or Lockhart. For its paging service,
an LEC can choose the path by which to transport the call to ASAP’s Austin switch. Upon receipt,
ASAP transmits the call to its paging terminal, also located in Austin. The terminal then transmits
the call, via the internet, to a satellite service in Chicago, Illinois, which then sends a wireless signal
to paging terminals, according to the paging customer’s fee plan with ASAP. ISP calls are
transmitted to ASAP’s switch in Austin over landline interconnection trunks between SWBT and
ASAP. When ASAP’s switch receives the call, ASAP routes the call over wireline connections to
the ISP, who is either located at ASAP’s Austin switch premises or has facilities at the switch
premises to transport the call to another site. ASAP’s contract with the ISPs requires all call traffic
to terminate at ASAP’s Austin switch.
                        CenturyTel is an ILEC in San Marcos and has a point of interconnection there with
SWBT. When a CenturyTel customer calls an ASAP customer, CenturyTel routes the call from its
end office to ASAP’s Austin tandem over SWBT’s intraLATA toll trunks. Initially, CenturyTel
routed these calls to ASAP’s Austin tandem toll-free on a temporary basis pending the negotiation
of agreements regarding those calls. ASAP refused to enter into any toll-free agreement, and,
consequently,


 CenturyTel began to charge its own San Marcos customers a toll when they called
ASAP’s NXX. This required customers to dial the 1+ ten digit phone number if they wished to place
a call from CenturyTel’s San Marcos switch to ASAP’s exchange. CenturyTel claims that it cannot
route calls from its switch to ASAP’s exchange by using the ELCS trunks,


 because ASAP’s switch
is in Austin. According to CenturyTel, only the toll trunks are designed to carry these calls to
ASAP’s Austin switch.
                        To prevent CenturyTel from imposing this toll charge on CenturyTel’s San Marcos
customers, ASAP filed a complaint with the PUC, claiming that all calls from San Marcos to its
Lockhart customers are “local” pursuant to the ELCS. The Administrative Law Judge (ALJ) held
a hearing and issued a Proposal for Decision (PFD) denying relief to ASAP. The PUC issued a final
order, adopting, for the most part, the ALJ’s PFD.


 ASAP brought suit in the district court in Travis
County, which affirmed the order. This appeal followed.




DISCUSSION
                        ASAP presents eight issues on appeal. In its first, second, and fourth issues, ASAP
contends that the district court erred in affirming the PUC’s determination that the calls in question
are toll calls under CenturyTel’s tariffs and applicable regulations. ASAP urges instead that calls
to its NXXs should be categorized as ELCS local calls and that its Austin switch is not the
termination point of the calls. In its fifth issue, ASAP contends that the district court erred in
affirming that CenturyTel’s actions were not anticompetitive in violation of PURA sections
52.108(3), 55.003(c), 55.005 and 55.006. In its seventh and eighth issues, ASAP argues that the
district court erred in affirming the categorization of ASAP’s ISP services. ASAP urges that its ISP
service is “incidental” to its CMRS service and that it thus does not have to register its ISP service
with the PUC. Finally, in its third and sixth issues, ASAP argues that the district court erred in
affirming that CenturyTel was not in violation of federal telecommunications law regarding the right
to interconnection and the right to local dialing parity. 

Standard of review
                        Because many of ASAP’s issues concern factual determinations made by the PUC
and reviewed by the trial court, we review them under the substantial-evidence standard. See Tex.
Util. Code Ann. § 15.001 (West 1998); Reliant Energy, Inc. v. Public Util. Comm’n, 153 S.W.3d
174, 184 (Tex. App.—Austin 2004, no pet.). We presume that the Commission’s findings are
supported by substantial evidence, and the contestant bears the burden of proving otherwise. See
Southwestern Pub. Serv. Co. v. Public Util. Comm’n, 962 S.W.2d 207, 215 (Tex. App.—Austin
1998, pet. denied). We will reverse and remand the cause to the agency when substantial rights of
the appellant have been prejudiced by an agency’s findings that are not reasonably supported by
substantial evidence considering the reliable evidence in the record as a whole. Tex. Gov’t Code
Ann. § 2001.174(2)(E) (West 2000). However, we may not substitute our judgment for that of the
agency on the weight of the evidence. Southwestern Pub. Serv. Co., 962 S.W.2d at 215. 
“Substantial evidence” does not mean a large or considerable amount of evidence but such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion of fact. Pierce v.
Underwood, 487 U.S. 552, 564-65 (1988); Lauderdale v. Department of Agric., 923 S.W.2d 834,
836 (Tex. App.—Austin 1996, no writ). The test is not whether the agency made the correct
conclusion in our view but whether some reasonable basis exists in the record for the agency’s
action. Railroad Comm’n v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 41 (Tex. 1991). We must
uphold an agency’s finding even if the evidence actually preponderates against it so long as enough
evidence suggests the agency’s determination was within the bounds of reasonableness. 
Southwestern Pub. Serv. Co., 962 S.W.2d at 215. 
ELCS
                        In its first, second, and fourth issues, ASAP argues that the PUC erred in focusing on
the geographic location of its switch. Instead, ASAP argues that, under PURA, an ELCS creates a
new LEC for a geographic area and that the assigned NXX is the only relevant factor in determining
whether a call is local for an ELCS. Accordingly, ASAP believes that the physical location of its
point of interconnection and switch and the PUC’s characterization of its business as being primarily
ISP-based are irrelevant. Because calls to its NXX must therefore be local, ASAP further asserts that
CenteryTel is violating the order that created the ELCS and that the PUC’s order, allowing
CenturyTel to impose long distance charges on calls made by its customers in San Marcos to
ASAP’s customers, permits CenturyTel to violate its own tariff. 

       Geographic location or assigned NXX
                        We begin with ASAP’s first issue, whether the district court erred in affirming the
PUC’s determination that an ELCS is a special arrangement that expands ILEC’s toll-free calling
only for calls that have a “geographic correlation” to the ELCS area. ASAP has not challenged the
agency rules but alleges only that the rules have been misapplied to the facts. 
                        In construing a statute, “our objective is to determine and give effect to the
Legislature’s intent.” National Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). 
Ordinarily, we first look at the statute’s plain and common meaning. Id. at 527. “But if a statute
defines a term, a court is bound to construe that term by its statutory definition only.” Texas Dep’t
of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002). Statutory construction is a question of law
for the court to decide. Id.; Johnson v. City of Fort Worth, 774 S.W.2d 653, 656 (Tex. 1989). We
review such legal questions de novo. Needham, 82 S.W.3d at 318.
                        In determining the scope of the PUC’s authority, we must read PURA and the
Telecommunications Act as a whole to discover the underlying legislative intent. State v. Public Util.
Comm’n, 883 S.W.2d 190, 196 (Tex. 1994); Cities of Corpus Christi v. Public Util. Comm’n, 2005
Tex. App. LEXIS, at *21-22 (Tex. App.—Austin, Sept. 23, 2005, pet. filed). We give weight to how
the PUC interprets its own powers, but only if that interpretation is reasonable and not inconsistent
with the statute. Continental Cas. Co. v. Downs, 81 S.W.3d 803, 807 (Tex. 2002); Cities of Corpus
Christi, 2005 Tex. App. LEXIS, at *22. The legislature intends to give an agency, created to centralize
expertise in a certain regulatory area, a large degree of latitude in the methods it uses to accomplish
its regulatory function. State v. Public Util. Comm’n, 883 S.W.2d 190, 197 (Tex. 1994); Texas Mun.
Power Agency v. Public Util. Comm’n, 150 S.W.3d 579, 586 (Tex. App.—Austin 2004, pet. granted). 
Nonetheless, an agency may not, in the guise of implied powers, exercise what is effectively a new
power, or a power contrary to statute, on the theory that such exercise is expedient for the agency’s
purpose, City of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 441 (Tex. 2002), nor may it
contravene specific statutory language, run counter to the general objectives of the statute, or impose
additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory
provisions. State v. Public Util. Comm’n, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet.
denied).
                        We construe the text of an administrative rule under the same principles as if it were
a statute. Continental Cas. Co. v. Rivera, 124 S.W.3d 705, 709-10 (Tex. App.—Austin 2003, pet.
denied). We bear in mind that an administrative agency has the power to interpret its own rules, and
its interpretation is entitled to great weight and deference. Id. at 710. The agency’s construction of
its rule is controlling unless it is plainly erroneous or inconsistent. Id.


 We do not consider the merits
of the PUC’s rules on a case-by-case basis. City of Garland v. Public Util. Comm’n of Tex., 165
S.W.3d 814, 819 (Tex. App.—Austin 2005, pet. filed). Rather, we consider whether the rule: (1)
contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3)
imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant
statutory provisions. Public Util. Comm’n, 131 S.W.3d at 321.
                        In PURA, the legislature gave the PUC authority to define the meanings and boundaries
of the ELCS. Tex. Util. Code Ann. § 55.041. The PUC may “expand a toll-free local calling area that
is not in a metropolitan exchange but is in a local calling area that is contiguous to a metropolitan
exchange that the [PUC] determines has a community of interest with the exchange for which a
petition is filed.” Id. § 55.042. A community may petition the PUC for expansion of the LEC’s toll-free local-calling area if the petitioning exchange’s central switching office is located within twenty-two miles of the central switching office of the exchange requested for expanded local calling service
or if it is “not more than 50 miles from the central office of the exchange requested for expanded local
calling service and the exchanges share a community of interest.” Id. § 55.045. 
                        The PUC thus defined the ELCS as a “ two-way toll-free local calling service provided
by an ILEC to telephone service subscribers.” 16 Tex. Admin. Code §§ 26.219(b)(1), .221(b)(3)
(2005). Mirroring the statute, the PUC rules mandate that the requested exchange areas


 have central
switching offices within twenty-two miles from one another, or that they share a “community of
interest,” which is satisfied where the “petitioning and petitioned exchanges have a relationship
because of schools, hospitals, local governments, or business centers, or that the petitioning or
petitioned exchanges have other relationships that make the unavailability of ELCS a hardship on
residents of the area.” Id. §§ 26.219(d)(3)(C), (d)(3)(D) (2005); see also Tex. Util. Code Ann.
§ 55.046(b), (c); 16 Tex. Admin Code § 26.219(d)(3)(A) (ELCS status not available when central
switching offices of petitioning and petitioned exchange are more than fifty miles apart). 
                        Both PURA and the PUC rules focus on geographical data when creating an ELCS. 
ELCS retail rating requires a geographical nexus of twenty-two miles, or a community of interest if
the geographical nexus is not more than fifty miles, between the called and calling parties. 
Historically, the PUC would use the NXX to determine whether the calls terminate within the ELCS’s
geographical requirements. Although the PUC no longer requires a geographic terminal point for an
NXX, when a carrier like ASAP allows its customers to choose their NXXs irrespective of geographic
location, it is a reasonable interpretation of the statutes to require a geographical nexus between the
customer and the NXX.


 We emphasize that the default rule in this case, without the creation of the
ELCS, would be that the calls in question would be toll calls. Only with the establishment of the
ELCS, a creature of Texas state law concerning intrastate communications, could the calls be made
toll free. Particularly, calls from San Marcos to one of the NXX exchanges in this case could only be
toll free if made under the terms of the statute and the PUC rules. Despite ASAP’s arguments to the
contrary, there is no new “San Marcos-Kyle-Fentress-Lockhartlocal calling area,” only a newly created
ELCS, for which the existing LEC must be compensated in some manner for the costs loss of revenue
associated with the creation of the ELCS. See Tex. Util. Code Ann. § 55.048.


 
                        The PUC’s construction of PURA and PUC rules controls unless it is plainly erroneous. 
See Rivera, 124 S.W.3d at 710. We find no reason to believe that the PUC’s requirement of
geographic proximity in the ELCS is erroneous.


 Instead, we give deference to the PUC’s approach
to this dynamic and shifting area of telecommunications practice. Accordingly, because the ELCS
requires a geographical nexus, ELCS eligibility may not be determined solely by the assigned NXX
in this circumstance. We overrule ASAP’s first issue.
       Substantial-evidence review
                        In its second issue, ASAP asserts that the PUC’s order incorrectly held that CenturyTel
did not violate the PUC’s orders establishing the ELCS between San Marcos and Kyle, Fentress, and
Lockhart. We construe this argument to consist of a substantial-evidence challenge to the PUC’s
conclusion that calls from CenturyTel’s San Marcos customers to ASAP’s paging and ISP customers
were toll calls and not ELCS toll-free.
                        ASAP concedes that it has neither a switch nor a point of interconnection within the
ELCS. When a call is made from a CenturyTel customer to an ASAP customer, whether to a paging
customer or to an ISP, the call must be routed outside of the ELCS to ASAP’s switch—located in
Austin—before it can be transferred to the end-caller. Aside from its paging services, the record shows
that the majority of calls to ASAP’s customers were directed to ASAP’s Austin ISP facilities. Only
one identified ISP customer, San Marcos Internet, has offices in San Marcos. However, San Marcos
Internet receives its calls through ASAP’s tandem in Austin, and then it arranges for the call to reach
its facilities in San Marcos. In addition, ASAP’s contracts with its ISP customers provide that calls
terminate at ASAP’s switch in Austin. We find there to be substantial evidence that the calls at issue
in this case are not entitled to local ELCS rating. We overrule ASAP’s second issue.
 
       CenturyTel’s tariff
                        We have determined that calls to ASAP’s Austin switch and point of interconnection
are not entitled to ELCS retail rating because they are located outside of the ELCS geographic
proximity. We now turn to ASAP’s fourth issue, whether CenturyTel violated its own tariff—which
permits CenturyTel customers to make unlimited calls within the “local” exchange—by imposing a
toll on CenturyTel customers for calls to ASAP’s NXXs. In particular, ASAP argues that CenturyTel’s
tariff defines an exchange area as the
 
unit established by [CenturyTel] for the administration of telecommunications service
in a specified area for which a separate local rate schedule is provided. The area
usually embraces a city, town, or village and its environs. It consists of one or more
central offices, together with associated plant facilities used in furnishing
telecommincations services in that area.
 
 
ASAP then notes that, after the establishment of the San Marcos-Kyle-Fentress-Lockhart ELCS,
CenturyTel has connected calls without imposing a toll with SWBT and Verizon outside of San
Marcos but within the ELCS. It concludes that failing to charge a toll for calls to SWBT and
Verizon customers in Kyle, Fentress, and Lockhart violates the terms of CenturyTel’s tariff. 
Otherwise, ASAP insists, the only means by which CenturyTel can act consistently with its tariff and
not charge tolls on calls to SWBT and Verizon customers is to consider that the inclusion of an
additional $.39 charge in CenturyTel’s tariff to compensate it for the costs associated with the ELSC
expands the definition of “exchange” in the tariff itself. That expansion must, by necessity, include
calls to ASAP’s customers.



                        Because we have already decided that calls to ASAP’s Austin switch and point of
interconnection do not qualify for ELCS, CenturyTel has not violated its tariff when it connects calls
without imposing a toll from its customers to SWBT and Verizon customers in Kyle, Fentress, and
Lockhart. The record establishes that CenturyTel did not treat calls to ASAP’s customers differently
from calls to Verizon or SWBT customers. Both Verizon and SWBT have arranged physical
network facilities and points of interconnection within the ELCS to carry calls directly from San
Marcos to Kyle, Fentress, and Lockhart. ASAP has not. Therefore, calls to Verizon and SWBT
customers are local calls under the ELCS, and calls to ASAP customers are not. Accordingly, we
agree with the PUC’s determination that CenturyTel did not violate its tariffs. We overrule ASAP’s
fourth issue. 

PURA’s anti-competitive provisions
                        In its fifth issue, ASAP contends that the PUC and the district court erred by
assuming that the calls to its customers were not local and by concluding that CenturyTel’s actions
were not anticompetitive or discriminatory. According to ASAP, these calls are local and, for that
reason, CenturyTel acted anticompetitively and discriminatorily by not charging a toll on calls to
customers served by wireline ILECs in Kyle, Fentress, and Lockhart while imposing a toll on calls
to ASAP’s paging and ISP customers. See Tex. Util. Code Ann. §§ 52.108(3) (West Supp. 2005),
55.003(c), .005, .006 (West 1998). We have already decided that the PUC did not err in
characterizing the calls to ASAP as non-local because they terminate at ASAP’s Austin switch,
outside of the ELCS. In fact, CenturyTel does not treat calls to ASAP customers any differently than
calls to Verizon and SWBT customers. Those companies have established interconnection facilities
in the geographic area to carry ELCS calls from San Marcos to Kyle, Fentress, and Lockhart. Calls
to ASAP customers are always routed to Austin. ASAP could establish the physical facilities in the
area or it could enter into billing agreements for those calls, but it has failed to do so. We therefore
find that substantial evidence to support the PUC’s determination in that CenturyTel’s imposition
of tolls on calls to ASAP’s customers was not anticompetitive or discriminatory. We overrule
ASAP’s fifth issue.

State regulation of ASAP’s ISP services
                        In its seventh and eighth issues, ASAP contends that its ISP service is “incidental”
to its CMRS service and, accordingly, cannot be regulated by Texas or the PUC because states may
not regulate purely CMRS providers. See id. § 51.003(5) (West 1998). ASAP further contends that
the PUC cannot assert jurisdiction over it because ASAP “provides only interstate services,” as
opposed to both interstate and intrastate services. ASAP concludes that, because the PUC does not
have jurisdiction over it, the PUC may not require it to register for its ISP services as a “basic local
telecommunications service” as defined in utilities code section 51.002(1).

       Incidental services
                        Specific to its seventh issue, ASAP argues that, if a telecommunications service is
“incidental” to a CMRS service, a state may not regulate that “incidental” service. See 47 U.S.C.A.
§ 332(c)(3) (West 2001). Because ASAP believes that its ISP service is “incidental” to its CMRS
service, it asserts that the district court erred in affirming the PUC’s determination that it could
require ASAP to register those services. See Tex. Util. Code Ann. § 52.103 (West 1998).
                        State authority is limited by the federal act, which states that “no State or local
government shall have any authority to regulate the entry of or the rates charged by any commercial
mobile service or any private mobile service, except that this paragraph shall not prohibit a State
from regulating the other terms and conditions of commercial mobile services.” 47 U.S.C.A.
§ 332(c)(3) (West 2001). The PUC decided that ASAP’s service to ISPs was not “incidental” to its
CMRS services and, therefore, that it could require ASAP to register its ISP services.



                        In this case, the record shows that none of the Kyle or Fentress NXXs, and only thirty
of the Lockhart NXXs, were assigned to ASAP’s paging customers (CMRS service). Therefore, the
remaining NXXs in Lockhart, and all of those in Kyle and Fentress, were assigned to ASAP’s ISP
customers (non-CMRS service). In addition, ASAP provides its ISP customers a wireline connection
so that they can access the Internet. As the ALJ observed, the record establishes that the only service
that ASAP provides ISPs is wireline transmissions of calls so that the ISPs’ customers can access
the internet. This service does not involve ASAP’s CMRS service in any way. Instead, while not
disputing the evidence in this case, ASAP would have us consider its unrelated use of the internet
to transmit its paging calls to its satellite service in Chicago, which then transmits the signal to
paging terminals. The ALJ and the PUC rejected ASAP’s contention that the Chicago-bound
internet message, which might be properly characterized as internet use incidental to CMRS service,
could be attributed broadly to ASAP’s transmission of calls to Austin to its ISP customers. We find
that record contains substantial evidence to support the PUC’s determination. Because the ISP
services are not incidental to ASAP’s CMRS services, the State may require ASAP to register that
service. We overrule ASAP’s seventh issue.

       Interstate services
                        In its eighth issue, ASAP argues that the PUC cannot accept jurisdiction over the ISP-bound calls because those calls are interstate and thus may be regulated only by the FCC.
                        State law is pre-empted under the Supremacy Clause of the United States Constitution
in three circumstances. See U.S. Const. art. VI. First, Congress can define explicitly the extent to
which its enactments pre-empt state law. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95-98
(1983). Pre-emption fundamentally is a question of congressional intent, see Schneidewind v. ANR
Pipeline Co., 485 U.S. 293, 299 (1988), and “when Congress has made its intent known through
explicit statutory language, the courts’ task is an easy one.” English v. General Elec. Co., 469 U.S.
72, 79 (1990). In this case, Congress has made its intent clear that the FCC and state commissions
share authority, and so we will not follow this prong of the analysis.
                        Second, in the absence of explicit statutory language, state law is pre-empted where
it regulates conduct in a field that Congress intended the federal government to occupy exclusively.
Id. Such an intent may be inferred from a “scheme of federal regulation . . . so pervasive as to make
reasonable the inference that Congress left no room for the States to supplement it,” or where an act
of Congress “touches a field in which the federal interest is so dominant that the federal system will
be assumed to preclude enforcement of state laws on the same subject.” Rice v. Santa Fe Elevator
Corp., 331 U.S. 218, 230 (1947). “Where . . . the field which congress is said to have pre-empted”
includes areas that have “been traditionally occupied by the States,” congressional intent to supersede
state laws must be “‘clear and manifest.’” Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977),
(quoting Rice, 331 U.S., at 230). Again, the federal statutory language is clear that the states share
regulatory authority, and so we will not apply the second prong.
                        Finally, state law is pre-empted to the extent that it actually conflicts with federal law.
Thus, the Court has found pre-emption where it is impossible for a private party to comply with both
state and federal requirements, see, e. g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S.
132, 142-143 (1963), or where state law “stands as an obstacle to the accomplishment and execution
of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U.S. 52, 67 (1941).                        In 1999, the FCC considered issues involving reciprocal compensation that LECs
wanted to recover from ISPs for communications delivered to ISPs. Initial Order, 14 FCC Rcd at
3689-90. In considering its own jurisdiction to consider the issue, the FCC had to determine if ISP
calls were intrastate (and thus outside of the FCC’s jurisdiction) or interstate (and thus within its
jurisdiction). Id. at 3696-97. The FCC thus turned to the nature of the transmission of information
at issue in conducting internet business and decided ISP calls terminated at the website being
accessed, not at the point at which the call is received by the ISP; thus, ISP calls could not be
characterized as “local” calls. See id. at 3697-98. As a result, the FCC found that ISP calls were
exempt from reciprocal compensation rules. See id. Noting that it had not yet adopted a rule
governing compensation for this type of communication, see id. at 3703, however, the FCC held that
LECs could reach their own interim agreements for the recovery of costs, to be enforced by state
commissions, or that state commissions could regulate this area until the formal adoption of an FCC
rule. Id. at 3703-05. The D.C. Circuit vacated the ruling, finding that the FCC had not adequately
explained its reasoning for determining that ISP calls were not “local” calls. Bell Atl. Tel. Cos. v.
Federal Communications Comm’n, 206 F.3d 1, 9 (D.C. Cir. 2000).
                        On remand, the FCC again concluded that such traffic is not subject to reciprocal
compensation. Implementation of the Local Competition Provisions in the Telecomms. Act of 1996,
16 FCC Rcd 9151, 9152-53 (2001) (Remand Order). Again, the central issue was reciprocal
compensation—when ILECs transported calls to ISPs related to CLECs, the ILECs argued that the
call did not terminate on a CLEC line but somewhere on the internet itself, thus obviating the
reciprocral compensation requirements. Id. at 9159. CLECs instead argued that the calls terminated
at the ISP, thus making them local calls for which the CLECs would be entitled to compensation. 
Id.
                        The FCC found that, under section 251(g) of the Telecommunications Act, Congress
“carved out” ISP services from the reciprocal compensation mandates of section 251(b)(5). Id. at
9152-53. The FCC abandoned its previous analysis that focused the “termination” of the call and
instead adopted a position focusing on the inter/intrastate nature of the communication, concluding
that “traffic bound for information service providers (including Internet access traffic) often has an
interstate component.” Id. at 9175. Because “the interstate and intrastate components cannot be
reliably separated . . . ISP traffic is properly classified as interstate, and it falls under the
Commission’s” jurisdiction to regulate charges. Id. In doing so, the Commission no longer found
it necessary to define at what point an internet-bound call “terminates.” Id. at 9177. Instead, the
FCC focused on the nature of the “communication”:

Most Internet-bound traffic traveling between a LEC’s subscriber and an ISP is
indisputably interstate in nature when viewed on an end-to-end basis. Users on the
Internet are interacting with a global network of connected computers. The consumer
contracts with an ISP to provide access to the Internet. Typically, when the customer
wishes to interact with a person, content, or computer, the customer’s computer calls
a number provided by the ISP that is assigned to an ISP modem bank. The ISP
modem answers the call (the familiar squelch of computers handshaking). The user
initiates a communication over the Internet by transmitting a command. In the case
of the web, the user requests a webpage. This request may be sent to the computer
that hosts the webpage. In real time, the web host may request that different pieces
of that webpage, which can be stored on different servers across the Internet, be sent,
also in real time, to the user. For example, on a sports page, only the format of the
webpage may be stored at the host computer in Chicago. The advertisement may
come from a computer in California (and it may be a different advertisement each
time the page is requested), the sports scores may come from a computer in New
York City, and a part of the webpage that measures Internet traffic and records the
user’s visit may involve a computer in Virginia. If the user decides to buy something
from this webpage, say a sports jersey, the user clicks on the purchase page and may
be transferred to a secure web server in Maryland for the transaction. A single web
address frequently results in the return of information from multiple computers in
various locations globally. These different pieces of the webpage will be sent to the
user over different network paths and assembled on the user’s display.


Id. at 9178. When “end-to-end” communications involving ISPs cross state lines, the FCC thus
categorized the link that the LEC provides to connect the end-user with an enhanced service provider
as interstate access service. Id. ISPs only technically modify and translate communication, so that
their customers will be able to interact with computers across the global internet; according to the
FCC, they are not the focus of the communication. Id. at 9180. The FCC then adopted a
“bill-and-keep” compensation system, whereby each carrier recovers its costs from its own
end-users, in the place of reciprocal compensation agreements. Id. at 9154-57.



                        Upon review of the Remand Order, the D.C. Circuit again remanded the case, finding
error in the FCC’s interpretation of sections 251(b)(5) and 251(g), which formed the basis for the
FCC’s order. WorldCom, Inc. v. Federal Communications Comm’n, 288 F.3d 429, 430, 432-34
(D.C. Cir. 2002). The court did not vacate the Remand Order, however, finding that “there is plainly
a non-trivial likelihood that the Commission has authority to elect such a system [of compensation].” 
Id. at 434. The FCC proceedings are still pending on remand and the Order on Remand remains in
effect. See Pacific Bell v. Pac-West Telecomm, Inc., 325 F.3d 1114, 1122-1123 (9th Cir. 2002). 
                        The situation at issue in this case is fundamentally different from the one considered
by the FCC in its reciprocal compensation decisions. In the reciprocal compensation problem, the
FCC has been attempting to solve in what manner LECs can recover their costs, but it is clear they
will be recovered in some manner. In this case, we have a simpler problem—the calls at issue travel
over lines that under Texas law are toll calls. CenturyTel cannot recover its costs for transporting
those calls through such mechanisms as have been provided by the ELCS statutes because no ELCS
includes San Marcos and Austin, and ASAP has refused to enter into interconnection agreements
to obviate the technical problems here. In this case, it does not matter whether the termination point
of these calls is in Texas or any other location but in what manner the calls are physically
transported, which is through lines from San Marcos to Austin that require a toll. State regulation
of the intrastate service, even if it affects interstate service, is not preempted unless it thwarts or
impedes a valid federal policy. See English, 496 U.S. at 78-79; Louisiana Pub. Serv. Comm’n v.
Federal Communications Comm’n, 476 U.S. 355, 375 n.4 (1986). Because our holding does not
thwart or impede federal policy in this area, but concerns an entirely Texas problem, we overrule
ASAP’s eighth issue.

Federal rights
                        In its third and sixth issues, ASAP complains that, by permitting CenturyTel to charge
a toll on calls to ASAP’s NXXs, the PUC violated ASAP’s federal interconnection and local dialing
parity rights.

       Interconnection
                        ASAP first argues that the PUC’s order denies it interconnection and numbering
resource rights as a CMRS carrier. In particular, ASAP argues that characterizing its CMRS service
as “terminating” at its Austin switch in effect treats ASAP as an end-use customer of the LEC and
not as a co-carrier. We disagree.
                        According to the FCC, a paging terminal performs a termination function because it
receives calls that originate on the LEC’s network and transmits the calls from its terminal to the
pager of the called party. In re TSR, 15 FCC Rcd at 11179. To perform this function, the terminal
first directs the page to an appropriate transmitter in the paging network, and then that transmitter
delivers the page to the recipient’s paging unit. Id. The terminal and the network thus perform
routing or switching and termination. Id. In addition, Type 2 interconnections, such as the ones
ASAP employs, are interconnection options where the CMRS provider owns the switch and provides
call origination and termination functions. Id. at 11180.
                        According to the FCC, a carrier’s interconnection rights concern how carriers must
compensate each other for the transport and termination of calls. Id. at 11184. They do not concern
charges which may be properly imposed on end users. Id. As a result, because of the overlap of
FCC regulations, state regulations, and the nature of the telecommunications industry, the same call
may be viewed as a local call by the carriers and a toll call by the end-user. Id. Even if, in this case,
the paging calls are local for the purpose of carrier-to-carrier compensation, the PUC did not violate
those interconnection rights by imposing long-distance tolls for those calls on the end-users. 
Interconnection rights do not inidicate whether the call is a toll call to the end user, an issue for the
states to determine within their systems of classifying local and toll calls. Thus, we do not find an
interconnection problem in this case. Furthermore, we note that it is within ASAP’s ability to
ameliorate this problem by entering into an interconnection agreement with CenturyTel, but it has
chosen not to do so. The record shows that CenturyTel offered to negotiate such an agreement and
that ASAP did not do so.


 

       Local dialing parity
                        Next, ASAP urges that the PUC’s order violates its local dialing parity rights. See
47 U.S.C.A. § 251(b)(3) (West 2001). ASAP argues that, because its NXXs are local, calls from
CenteryTel’s customers in San Marcos to ASAP’s customers should only require local
dialing—seven digits (NXX-XXXX)—in the same way that calls entirely within San Marcos do. 
                        Under section 251(b)(3) of the Telecommunications Act, an LEC is required to permit
telephone exchange service customers within a defined local calling area to dial the same number
of digits to make a local telephone call as they would to other customers of the LEC, notwithstanding
the identity of a customer’s or the called party’s local telephone service provider. Implementation
of the Local Competition Provisions of the Telecomms. Act of 1996, Part III, 61 Fed. Reg. 47,284,
47,297 (Sept. 6, 1996) (adopting 47 C.F.R. pts. 51, 52). To the extent that a CMRS provider offers
telephone exchange service, such a provider is entitled to receive the benefits of local dialing parity. 
Id. at 47,298. Local dialing parity will be accomplished through implementation of the unbundling,
number portability and interconnection requirements of section 251. Id. The provision of
nondiscriminatory access to telephone numbers, by itself, does not fulfill the local dialing parity
mandate of section 251(b)(3). Id.
                        In adopting rules concerning local dialing parity, the FCC has recognized that a
telephone call requiring seven-digit dialing is not necessarily a local call, that a telephone call
requiring ten-digit dialing is not necessarily a toll call, and that some states with ELCS arrangements
may have varying interpretations as to what constitutes a local or toll call. Id. at 47,299. The FCC
has not imposed a local dialing parity rule in contravention of various state practices. See id. 
Instead, it defers to the states’ definitions of local and toll calls and only mandates that service
providers be given local dialing parity based on the state’s approach to defining local calls, regardless
of whether the service provider chooses to utilize seven or ten digit dialing procedures for those
calls. Id.
                        In this case, both Verizon and SWBT have points of interconnection within the ELCS
and thus are able to offer local calling with seven-digit dialing. In contrast, we have already
determined that the PUC did not err in finding that calls from CenturyTel’s San Marcos customers
to ASAP’s NXXs are not local under Texas law. CMRS providers such as ASAP have considerable
latitude in assigning numbers. Although the wireless service is not limited to use within that rate
center, the wireless subscriber’s number is associated with a specific geographic rate center. See In
re Telephone Number Portability, 18 F.C.C. Rcd 23,697, 23,701(2003). NXXs that have a nominal
geographic assignment, but that are divorced by the actual method of transport from the geographic
rate center, cannot be used as the sole factor in determining local dialing parity issues. In other
words, it does not matter where ASAP’s paging customer is; it does matter how ASAP requires
CenturyTel to transport the call from San Marcos to ASAP for transmission of a paging signal to the
customer.
                        The evidence in this record establishes that calls to ASAP’s paging customers are
transported from San Marcos to Austin. The nominal assignment of ASAP’s NXXs to Kyle,
Fentress, and Lockhart does not change this technological fact. In addition, the record also
establishes that the majority of calls to ASAP’s NXXs are calls to ASAP’s ISP customers, calls that
are properly understood as wireline and not CMRS calls. ASAP has no point of interconnection in
the ELCS. Based on this evidence, we find that the Commission did not violate any local dialing
parity issues. 

       Other issues
                        ASAP makes further arguments that the PUC wrongly equated CMRS with a wireline
network and violated ASAP’s CMRS rights to use Type 2 interconnections. The thrust of ASAP’s
arguments on this point is that the PUC 

wrongly applies wireline concepts to ASAP’s mobile, paging service when it
concludes that CenturyTel can impose retail toll charges on its end users who call
ASAP’s paging customers who are not (or are deemed to not be) within the ELCS
area. We are addressing mobile service. Being mobile—and occasionally outside
the wireline local calling area—is not a crime that is punishable by a toll.
 
 
As we have noted, it is not the location of the paging customer that is at issue here. Instead, it is only
the means by which calls must be transported from San Marcos to ASAP for ASAP to send a paging
signal to its customers. No customer of ASAP is being “punished” for being mobile. The PUC is
only allowing CenturyTel to recoup its costs from its San Marcos customers for placing a call to
Austin, outside the ELCS. 
                        In addition, ASAP attempts to compare the issues in this case to those that arise in
the context of number portability. See Central Tex. Tel. Coop. v. Federal Communications Comm’n,
402 F.3d 205, 211-12 (D.C. Cir. 2005); United States Telecom Ass’n v. Federal Communications
Comm’n, 400 F.3d 29, 32 (D.C. Cir. 2005).


 Two types of “portability” exist. “Number portability”
is “the ability of users of telecommunications services to retain, at the same location, existing
telecommunications numbers without impairment of quality, reliability, or convenience when
switching from one telecommunications carrier to another.” 47 U.S.C.A. § 153(30) (West 2001).
“Location portability” to which ASAP makes its comparison, is “the ability of users of
telecommunications services to retain existing telecommunications numbers without impairment of
quality, reliability, or convenience when moving from one physical location to another.” Central
Tex. Tel. Coop., 402 F.3d at 206-07. The FCC rules currently permit only a limited location
portability. See United States Telecom Ass’n, 400 F.3d at 38. The Telecommunications Act’s
“requirement to provide number portability is limited to situations when users remain ‘at the same
location,’ and ‘switch[] from one telecommunications carrier to another,’ and thus does not include
service and location portability.” In re Telephone Number Portability, 11 FCC Rcd 8352, 8447
(1996) (citing 47 U.S.C.A. § 153(30)). As the D.C. Circuit has observed, location portability has
a distinctly geographic focus. United States Telecom Ass’n, 400 F.3d at 32, 37. Telephone
subscribers must change their telephone numbers when they move outside the area served by their
current central office, defined as the location of the switch. Central Tex. Tel. Coop., 402 F.3d at 207.
Thus, location portability only exists when a wireline customer moves physical location within the
area covered by the switch identified with the existing NXX. “In the completely wireless context,
however, customers who move, temporarily or permanently, may retain their numbers. They may
do so not because there is location portability, but because, despite their moves, they are still within
an area their current wireless carrier serves.” Id. at 212. In other words, calls to wireless customers
utilize the technological rate centers as originally assigned; there are no location portability issues
because a call to the wireless customer is still transported to the same switch as originally assigned
without regard to the location of the wireless customer.
                        The relationship between a wireline and a wireless company in portability is different. 
Although the geographic location of the wireless customer may not be controlling, when porting
numbers to wireless carriers that do not have a point of presence in the local area, a donating carrier
delivering a call to a ported number might be forced to deliver the call outside of its local service
area. See id. at 208. It would thereby incur transport charges that were not factored into its rate. Id.
To focus on the “location” of the telephone number, based solely on its nominal rate center
assignment, “is at best metaphysical.” See United States Telecom Ass’n, 400 F.3d at 37. 
                        ASAP’s reference to the number portability issues does not inform our analysis here.
Portability, in essence, requires the rating of formerly local calls as local when the number has been
“ported” to another carrier within the same geographic rate center. Problems have arisen concerning
the portability of wireline numbers to wireless providers when the customer has also moved
geographic locations. However, the portability issues only preclude charging a toll on a call that was
local before the number was ported to another carrier and might thus become a toll call but for the
portability requirements. ASAP’s numbers neither were ported from another carrier nor have they
ever been in CenturyTel’s geographic rate center. Thus, we do not find that portability issues
illuminate the problems in this case.

       Conclusion as to interconnection and local dialing parity rights
                        We have rejected ASAP’s arguments concerning its interconnection and local dialing
parity rights. We overrule ASAP’s third and sixth issues.

CONCLUSION
                        Having overruled ASAP’s issues on appeal, we affirm the judgment of the district
court affirming the order of the PUC.
 
 
                                                                                                                                                            
                                                                        Bob Pemberton, Justice
Before Chief Justice Law, Justices Pemberton and Waldrop
Affirmed
Filed: May 5, 2006