### PIA–ASHEVILLE, INC.

v.

### Otis R. BOWEN, Secretary, Department of H.H.S., Appellant.

No. 87–5238.

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1988.

Decided June 24, 1988.

Wendy M. Keats, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph diGenova,* and Anthony J. Steinmeyer, Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Michael G. Scheininger, Washington, D.C., for appellee.

Before MIKVA and SILBERMAN, Circuit Judges, and PARKER,** Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SILBERMAN.

---

\* United States Attorney at the time the brief was filed.

\*\* Sitting by designation pursuant to 28 U.S.C. § 292(a).

SILBERMAN, Circuit Judge:

The Secretary of Health and Human Services denied reimbursement to a Medicare provider for certain depreciation expenses. The provider had acquired the underlying assets in a two-step transaction, first buying the stock of the corporations that owned the assets, then liquidating those corporations and distributing the assets to itself. The Secretary, relying on his regulation, refused to allow the provider to step up its basis for the assets to reflect the purchase price of the stock. The provider sought review in the district court, which held the regulation "unreasonable and inconsistent with the statute." We affirm.

## I.

The Medicare Act requires that participating providers of health care be reimbursed for their "reasonable costs," defined as direct or indirect costs actually incurred, less any amount found to be unnecessary to the efficient delivery of health services. 42 U.S.C. § 1395x(v)(1)(A) (1982).[1] The Secretary generally recognizes capital depreciation as a reimbursable expense. See 42 C.F.R. § 413.134(a), (b), (f) (1987). Such depreciation is based on the "historical cost"—i.e. the cost actually incurred by the Medicare provider—of the asset. Id. Typically, then, assets are revalued, or their cost basis is "stepped up," when they are transferred, and the provider who acquired the assets thereafter depreciates them according to the amount it paid. The Department of Health and Human Service's regulations, however, explicitly state that no step-up of the basis of assets to the acquirer's purchase price will be available for Medicare reimbursement purposes in a two-step acquisition: when purchase of the stock of a provider is followed, no matter how quickly, by liquidation and distribution of the acquired company's assets to the acquirer. Id. § 413.134(k)(2)(ii).[2]

In 1981, PIA–Asheville engaged in just such a transaction. This psychiatric hospital holding company bought 100% of the stock of Asheville Holding Company, Inc. and Appalachian Hall, Inc.—the latter being a Medicare provider—in February of 1981. The two acquired corporations together owned the building, equipment, and furniture of Appalachian Hall, which they operated as a psychiatric hospital. In April of 1981, PIA–Asheville dissolved the wholly owned corporations and distributed the fully depreciated assets of the hospital to itself. When PIA–Asheville sought to step up its basis in the acquired assets to the cost of acquiring the stock and to depreciate the assets from that level, Blue Cross and Blue Shield of North Carolina, the fiscal intermediary for Medicare, denied reimbursement, relying on 42 C.F.R. § 413.134(k)(2)(ii). The Provider Reimbursement Review Board and the Secretary in turn upheld that denial.

PIA–Asheville sought review of this decision in the district court. See 42 U.S.C. § 1395oo (f)(1). The district court held that our prior opinion in Humana, Inc. v. Heckler, 758 F.2d 696 (D.C.Cir.1985) (per curiam), cert. denied, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986) "essentially decided" this case, and ruled in favor of PIA–Asheville, remanding to allow calculation of the reimbursement due. PIA–Asheville, Inc. v. Bowen, No. 86–0778 (D.D.C. Apr. 14, 1987) [available on WESTLAW, 1987 WL 11313].

## II.

In Humana, we considered eight transactions virtually identical to the one in this case. There as well, the Secretary denied a stepped up basis. But in Humana, the Secretary relied not on the regulation at issue here, which had not been promulgated at the time of the various transactions, but on a policy derived from existing

---

1. Although the change does not affect the cost year at issue in this case, the Medicare statute now requires that most expenses be reimbursed through the "prospective payment system." See 42 U.S.C. § 1395ww (Supp. III 1985).

2. This subsection of the regulations has been recodified. At the time of the transaction in question here, the regulation appeared at 42 C.F.R. § 405.415(l) (1980). The district court refers to that codification.

regulations.[3] The Secretary reasoned that, since a stock transfer was not treated as a change of ownership and hence was not an occasion for revaluation of assets, and since a provider could not revalue assets obtained from a related party (such as a wholly owned subsidiary), a two-step transaction consisting of a stock transfer and a transfer of assets from subsidiary to parent would not be an occasion for a step-up in basis. 758 F.2d at 704–05.

We rejected this artificial approach, holding it "arbitrary, erroneous and irrational" not to treat the acquisition as a single, integrated purchase. *Id.* at 705. By focusing on each of the steps in turn, we held, the Secretary ignored the essence of the transaction and unreasonably denied reimbursement for what was, in substance, an asset acquisition. *Id.* The Secretary defended the denial of reimbursement in *Humana* by arguing that requiring reimbursement for higher depreciation after such two-step transactions would impair the Secretary's ability to avoid over-reimbursement for certain costs by "recapturing" excess depreciation. As we explained in *Humana,* a provider that receives depreciation reimbursement from Medicare, and then sells the underlying asset for a figure greater than its purchase price minus depreciation, receives a windfall from Medicare. *Id.* at 706. The Secretary's regulations provide for recapture of that windfall by the Government. The Secretary argued, however, the regulations did not cover two-step mergers, so any windfall would not be recaptured if a stepped up basis were recognized. Because the recapture problem appeared to flow solely from the Secretary's own regulatory structure, we reasoned that the statutory "requirements of fair reimbursement should determine the character of the recapture regulations, not vice versa," and refused to uphold the policy on those grounds. *Id.* at 707.

The Secretary offers no new substantive justification for his erstwhile policy, but instead claims that the existence of the new regulation incorporating that policy

should change our view. First, he argues that the *Humana* panel considered the reasonableness of the policy, not with respect to the statute, but as it comported with existing regulations. The Secretary's reading of *Humana,* however, is untenable. We made plain there that it was the statutory requirement of reimbursement for reasonable costs that drove our decision. *Id.* at 705 & n. 68.

Next, the Secretary suggests that the act of codification itself lends the policy a legitimacy it did not have at the time of *Humana.* But where the basis for rejection of a policy is its repugnance to the statutory scheme it purports to further, regulatory codification is of utterly no significance. Of course, agency regulations interpreting statutes the agency is authorized to enforce are entitled to judicial deference. But we already recognized in *Humana* that our scope of review was quite limited:

> As a reviewing court, we are permitted to set aside the Secretary's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." It is undisputed that Congress, in the statute, granted broad discretion to the Secretary to develop the "reasonable cost" concept through regulations. The Secretary's interpretations of the statutes that she administers are entitled to *great deference.*

758 F.2d at 699 (footnotes omitted; emphasis added); *see also BATF v. FLRA,* 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983) (administering agency's interpretations due deference regardless of form). Having received such deferential consideration then, the Secretary cannot now claim that the respect we must show his regulation compels a result contrary to *Humana's.*

Nor can *Humana* be distinguished, as the Secretary suggests, because the regulation gives notice to providers that the policy did not and therefore allows them to avoid its snares. *Humana* did not rely on

---

**3.** The Humana court noted the adoption of the new regulation, but did not opine on its significance. 758 F.2d at 705 n. 65.

the absence of notice. Because there is no relevant difference between this case and *Humana*,[4] the judgment of the district court is

*Affirmed.*

4. Actually, we find it somewhat difficult to un- derstand why the Government filed this appeal.